and call our second case of this afternoon. Mendoza-Ordonez v. Atty Gen USA No. 16-3333 Messrs. Brophy and Leon, take your time setting up. May it please the Court and good afternoon, Your Honors. My name is Joseph Alexander Brophy. I represent Petitioner Luis Mendoza-Ordonez. I would like to ask the Court to reserve three minutes for rebuttal, if I may. That's fine. Your Honors, the issue before this Court is now narrow. The issue is whether there is substantial evidence supporting the BIA's conclusion on the question of whether Honduras is willing and able to protect Mr. Mendoza from harm. We agree with Attorney Leo for the Government that... Does the National Party still have control in the country? Yes, Your Honor, I believe so. And the most recent country conditions, although of course they're not in the record since this case was brought before the agency early last year, there's not been a noticeable improvement in the rule of law. And the most recent Department of State report discusses the impunity for crime in Honduras. Let me just make sure I understand. So you're not pursuing asylum, correct? We did ask... I understand you did, but this Court issued an opinion. So are you pursuing asylum or not? At this point, we acknowledge that Martinez-Gazoon is controlling, and that's pretty dispositive of the asylum claim. However, there was a withholding of removal claim that was adjudicated on the merits through the agency. I don't believe Martinez-Gazoon has any effect on Mr. Mendoza's withholding claim, which is really where the central errors were made by the Board of Immigration. Again, there's a distinction between withholding and asylum. Oh, of course, Your Honor. So this is all about withholding and not asylum? That's correct, Your Honor. Yes. Now here, three of the agency's conclusions that were key went in Mr. Mendoza's favor. His testimony was found credible by the immigration judge. He was found to have experienced past persecution, and that past persecution was found to be due to his political opinion. And the issue that's before this Court is the conclusion that Honduras is somehow willing and able to protect Mr. Mendoza for harm. What do you make of the government's argument that the individual that murdered his father was jailed, albeit for six months? Your Honor, I believe that's a red herring. I mean, you're looking at a conviction that happened for a murder that took place 14 or 15 years before the threats that were made against Mr. Mendoza. The record indicates that Mr. Mendoza reported the death threat in 2014 and that the local judiciary took no action in response. He then attempted to flee to the United States, was subject to expedited removal, and then after being returned to Honduras, had a second threat that occurred in April 2015. Looking at those two threats, where there's been an intervening coup in the country, where the national party is in complete control, and looking at the country conditions evidence, which is really where the agency, I think, went astray here, the country conditions evidence really draws a distinction between the rule of law in Honduras before the coup and after the coup. A coup intervening between a 2000 murder and a 2014 death threat is significant. One of the articles that we submitted was a New York Times article indicating that the rule of law had evaporated in Honduras since the coup. Another was an NGO report from... Actually, you don't even need a New York Times article necessarily, do you? You have the country reports from the State Department. That's correct, Your Honor. And the country condition from the State Department also confirms that impunity and the lack of rule of law was a huge problem in Honduras, and also that for individuals, well, for the judiciary in Honduras, face a lot of political interference. Here, one thing that wasn't really addressed by the agency is that Mr. Mendoza, as a member of a minority political party, the Liberal Party, and essentially the jurisdiction of his case, where he went to complain to the court, was a judge from the National Party who actually was related in a way to the person who murdered his father and the person who made the death threats against him. So his hands were basically essentially tied by this construct where he was of a minority political party in a country where any crime is very unlikely to be investigated, much less when the victim is a minority. What was the background pertaining to the deaths of the father and the uncle of Mr. Mendoza? So Mr. Mendoza's father was a politician in the Liberal Party. He lost a mayoral election in the late 90s to an individual who was actually the aunt of the judge in this current situation when he made his complaints. And then celebrating New Year's, Millennium New Year's... That's Mayor Aguilar. Mayor Aguilar, yes, correct, Your Honor. And this individual, Gerardo Valladares, murdered Mr. Martinez, Mr. Mendoza's father, during the New Year Millennium celebration. A court in Honduras did convict Mr. Valladares for that murder. However, the record testimony is a little sketchy in this regard, but it's undisputed that the sentence was short that he received for this. What is the... Do we know what the normal sentence is for murder in Honduras? There's nothing in the record as to that, Your Honor. I can say that I did research that on my own after this decision took place. And I can't completely... I believe it was somewhere in the range of 20 to 30 years would be what the statutory sentence would be for a murder. And I believe a political assassination carried extra enhancement under the law. It's something that I'd be happy to look into if Your Honor's would like additional briefing on it. You may want to just submit something, and then the other side, you have the chance to respond to it, take a week after to respond to it. So can you give us something in a week after that to respond? I'd be happy to do that, Your Honor. What do you make of the government's argument that he was... He put himself in harm's way, I'm kind of paraphrasing, by going back to his hometown as opposed to staying in Tegucigalpa where he was okay? Well, I understand the government's argument on that. I think I would respond to that in two ways. One would be that there was a conclusion by the immigration judge that Mr. Mendoza could have reasonably relocated to Tegucigalpa. However, the Board of Immigration Appeals passed on that conclusion and did not affirm on that basis which would, based on this court's precedent, make that part of the agency decision that's not before the court today. As far as the logic of returning to a place where Mr. Mendoza feared persecution, one could certainly question the wisdom of that choice. However, the fact remains that when he was there, he did experience a death threat, and that the agency here did find that that constituted past persecution when he received that death threat both in 2014 and in 2015. One of the things I'd like to explore with you, you say that the BIA cited COELA for the standard of review and appeal and that, in fact, the standard they cited was from motions to reopen rather than the standard for direct appeals. That's exactly right, Your Honor. So how are the standards different, and how does that difference affect you adversely? The standard for a motion to reopen, as discussed in matter of COLEJO, is in the nature of an abuse of discretion review, essentially. COELA discusses how it's a discretionary standard where somebody is actually seeking to reopen a proceeding based on evidence that was not originally before the agency, and the agency then needs to review whether the petitioner has met the heavy burden that that evidence would have changed the result. By contrast, this was a direct appeal of a denial of withholding claim. There's clear error review of a decision that's essentially deemed a factual determination by the integration judge. However, certainly a lower standard of review than the abuse of discretion that would go into a motion to reopen. Although, for a direct appeal, it's a definite and firm conviction that a mistake has been committed? Is Your Honor referring to the substantial evidence standard of review or the BIA standard of review? I'm talking about the standard for direct appeals. I thought the standard for direct appeals is, quote, though there is evidence to support it, the review in court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. Yes, that's correct, Your Honor. However, I still believe there's a difference between that and the discretionary standard that would go to a motion to reopen. And also, it's difficult to have... Actually, we don't have jurisdiction even to review a discretionary standard, do we? That's correct, of course, Your Honor. And beyond that, if this court would look at, for instance, this decision in Zubeda v. Ashcroft, which was a cat claim as opposed to a withholding claim but still has a discussion that's prescient to this matter, the court held that the BIA analysis was inadequate to afford a meaningful review that both Zubeda and the INS deserve. And I believe that's exactly what we have here. There can be no confidence that the BIA actually did its job here of looking at this evidence that the IJ completely failed to discuss and to determine... Zubeda is being innocent of country conditions. That's exactly right, Your Honor. And the country conditions are uniform in that impunity is the norm in Honduras and that if there was any investigation or anything done in response to his complaints, it would have been a remarkable exception to how the rule of law actually functions in Honduras. And briefly, I see I only have a minute or so left. I'd like to... I mean, while the evidence here, our position, compels the conclusion that Honduras is unable or unwilling to protect Mendoza from harm, Mr. Mendoza can also prevail in his petition for review based simply on the failure to address these relevant country conditions that were before it. That would be, according to this court's precedent, in Valdevieza 1, as well as in Fiajo v. Attorney General, I'm going to pronounce this wrong, but Gebrehiwot v. Attorney General, all of which were cases where the court didn't reach the ultimate conclusion that the evidence compelled a contrary result, but still looked at the evidence that was before it and said, well, there was a lot here that was missed by the agency. We believe the proper course here is to remand and allow the agency to consider it in the first instance. So even if the court is not willing to go all the way and say that the evidence here compelled an opposite conclusion, I think that the agency should be given a chance to actually do its job here, which I don't believe it did. All right. Thank you. Judge Nygard, do you have any questions? No, you've asked all that I have. Thank you. Thank you, Your Honor. Thank you, Mr. Bacalobo. Mr. Linio? Welcome back. Thank you, Your Honors. Good afternoon, Your Honors, and may it please the court. Attorney Salvatino F. Leo on behalf of the Attorney General of the United States of America. My biggest concern relates to the country conditions, and I don't see the country conditions report, plural, ever referred to at all in the IJ's opinion or in the BIA opinion. It's a reference to the IJ's that I reviewed, 1, 2, 3, 4, 5, and it does mention the country conditions report, but there's no discussion of that. And, Your Honor, that is correct. I think what the immigration does with respect to a good job with regard to her particular decision in this case is that, one, she goes ahead and lists all the evidence that was submitted on behalf of the petitioner as well as summarizing the testimony that was presented on behalf of the petitioner, and then goes ahead and specifically in her decision says, even though I do not refer to, even what is not referred to, I have taken into account the entire record and evidence submitted, and I think this case, as well as numerous circuit courts of appeals, have continued to rule ad nauseum that the agency need not write an exegesis on regard to every particular aspect. But the evidence is so significant as the country conditions reports here. I mean, just for example, on page 332, AR 332, the police investigate only 4% of reported crimes, not convict. Investigate only 4% of reported crimes. Page AR 363, under a rate of impunity, perpetrators of extrajudicial killings and political violence go unpunished. AR 326, the government did not successfully prosecute any of the 29 cases that this one person, HRW, had investigated. That was in the 2013 report. I could go on and on and on. I mean, it looks like, forget Wild West, I mean, this is the Wild West on steroids. And, Your Honor, you are correct. And I would say that Honduras is a nation in Latin America that is continuing to deal with criminal strife as well as political corruption. I will say that as we refer to in our brief, which specifically talks about the 2014 Department of State country reports, talked about the elections were credible in 2013, and throughout these particular country reports, at least there's indication that the government is attempting to do something, although not doing it well, and not able to do it well, but they are attempting to do something with regard to combating the criminal strife that is perpetuated, I guess, throughout Honduras. And I think what's even most important is, in this particular case, we don't have simply a stack of country reports information, and that is all in the record. We have actual facts with regard to this specific alien, with regard to what has occurred to him and his family in Honduras. And there is evidence that not only, and the evidence was provided by Petitioner, and that was found to be a finding of fact by the immigration judge, is that this particular individual that murdered his father in 2000 was, in fact, apprehended, prosecuted, convicted, imprisoned. Well, there's a dispute in the record with regard to the specific amount of time, because there is the constancy that was submitted by Petitioner in this particular case that was arguably that this individual was imprisoned for a period of up to two years. Now, there's a dispute in the record. Two years. Does that change the matrix? Well, specifically with regard to whether or not the government is unable or unwilling to protect Petitioner, the rule here is not that we, with the American scope of justice and conscience of justice, that we are satisfied with the prosecution. That's not the standard here. The standard is, are they unable and willing to protect this particular Petitioner from this persecution that the government is unable to control? And if anything, in this particular case, unlike the numerous cases cited by Petitioner, in this particular case we have hard evidence that the government of Honduras, not only for his father, the murder of his father, but also the murder of his uncle, that that individual was arrested, prosecuted, convicted. These are prime examples, and I think that's one of the main reasons that the agency doesn't delve into the significant amount of information in the country reports. But compared to the punishment that one would receive in this country for a first-degree murder, we're talking literally about the darkest night to the brightest day. And, Your Honor, I'm not sitting here and going to dispute that point. I'm not sitting here and going to dispute the point that an individual who is assassinated due to his political opinion, receiving two years or six months or whatever, or even longer than the two years if we wanted to talk about it, is enough for our perception of justice. But that's really not the case. Then the very person that kills his father, he runs into in April of 2015, and that person puts a gun to his head and threatens to kill him if he doesn't cease getting involved in political matters. Mr. Mendoza goes to a judge, and the judge does nothing. And it turns out that the judge is related in some way to parties that would be antithetical to Mendoza. It doesn't look pretty. It does not, Your Honor. And I understand Your Honor's concern with regard to that. But what I would do is, and I have to take this score, I think, back to what the standard is in this particular case. Does the record evidence here compel a contrary conclusion? We can sit here and argue over what the facts and what the record facts are, whether or not we feel... Well, the colloquial term that we often use, as you know, is willful blindness. And why was there not evidence of willful blindness here, with regard to the acquiescence of the Honduran government to a threat on Mendoza's life, especially when the person making the threat had previously killed Mendoza's father? Well, specifically here, with regard to the withholding of removal, the concept of willful blindness goes to with regard to the Convention Against Torture claims, not with regard to withholding claims, which withholding claims are separate and distinct from a Convention Against Torture claim. Here, there's no concept of willful blindness. There's a concept of whether or not the government is unable or unwilling to control the government with regard to these particular matters. Well, it appears that the government here is clearly unable to control things, because they don't even convict in 4%. They only investigate 4% of the reported crime in the country. I mean, the facts here are really bad. And those facts are so significant, not to have them discussed by the IJ, not to have them discussed by the BIA, in and of itself seems to call for a remand. It doesn't mean you don't win in the end, but as they say in South Florida, no looking too good today. Your Honors, and I understand this Court's concern with regard to this plethora of evidence that with regard to the government's conduct in Honduras, but again, I must take this Court, I think, back to the standard. It is not a situation in which are they truly unable or unwilling to control these players in Honduras? Are they doing their best? Well, it looks like they're either unable, because they don't do much, or they're unwilling, they're not willing to do much. Either way, it doesn't look good. I understand, and I think this is a situation, again, where they're sort of parsing the facts, the record facts of what they are, but do these particular record facts compel a contrary conclusion to what the agency came with, when specifically in this particular situation, and I think I would concede with this Court right here, right now, at this very moment, had there not been any evidence whatsoever with regard to the conviction, the prosecution, the arrest of this petitioner's aliens in Honduras, I mean, this petitioner's relatives in Honduras with regard to political issues and those political assassinations or deaths or murders, or however you characterize them, and if those were not there, I would say, yes, it probably does compel a contrary conclusion. You put a lot of stock in the fact that there were two convictions, but you have two murders, one murder, maybe two years, we don't know the sentence on the second, and then a gun's pointed at the man's head when he goes back. I mean, any of us in this room would be fearful for our lives or would want to get out, which is what he did. And I understand, and I understand the concern, and I think that if we even look at the facts with regard to the most recent death threats that this particular petitioner faced in Honduras, although we concede that he went to the particular judge Aguilar, and Aguilar has aligned himself or herself, and I can't recall, herself, with regard to the national party, there's nothing in the record to indicate that he went to the police officers, he went to other avenues of authority. But the protocol there is to go to the judge, right? The protocol there is to go to the judge. And they run up the investigations. And the person he claimed to have, he went to the wrong person. Wasn't Valladares' father politically and romantically involved with Mayor Aguilar? Or wasn't there evidence of that? There's evidence of a relationship, yes, Your Honor. There's evidence of a relationship there, there's no question. And then the argument would be, is this particular judge one of few corrupt judges in Honduras that the petitioner went ahead and went to conduct the investigation? And is there no onus on the part of the petitioner to seek out additional help, knowing full well that going to this particular judge would not benefit him in the long run? Well, according to the appendix 332, Congress and business elites exert excessive influence over the Honduran judiciary. So where was he supposed to go? To a different judge? I would state to Your Honor with much deference that it does say exert excessive influence. It doesn't say 100% of the judiciary is corrupt. And I would also add that there's no situation which there is no corruption anywhere. And if it was a simple fact that we were just looking at country reports and having an indication of what these country reports say with regard to his political opinion, we might have a better argument. But I think what factoring in what we've seen Honduras do to protect, I would add, or at least after the fact with regard to his family with these arrests and these convictions, that these are monumental steps for the Honduran government to take. And for us to sit here now and say that this, even though we're not happy with those results, to say that they're unable and unwilling to protect petitioner, I think that's a leap too far. But what are they then? If they're not unable and not unwilling, what are they? What would you cast on this as a description that works? They are ready, willing, able, and moving in the direction to become a nation that believes in the rule of law. How are they not? I mean, we have a situation which we've cited in our brief, and it was in the 2014 State Department reports that says the elections were credible, and there is forward-leaning or forward-moving. Yes, does it pale in comparison to the other number of articles, New York Times articles, et cetera? Yes. And if we were just to put them on a scale and weigh each other, is that the standard? No. But I would say we're in a situation here, does this record evidence compel a contrary conclusion? And, again, I would add that we have this evidence that the government of Honduras have actually done something to protect this particular area. So when the Bureau of VA reviewed this decision, the IJ's decision, and it relied on COELA, is that the appropriate standard of review? You agree that there's legal error there, right? My opinion is if you look at the beginning, page two of their decision, they talk about specifically what their level of review is, immigration judges' factual findings are clearly erroneous. All other issues are reviewed de novo. They go into matter of COELA, which talks about motions to remand, motions to reopen, which I concur with regard to Petitioner's argument, with regard to that's really abuse of discretion, does this new evidence change the standard? Now, what I think the Board did here and did kind of they didn't do it effectively, as they say. But even if we were to consider this particular appeal for purposes of a motion to reopen, because they go in and they say furthermore, and they talk about additional evidence that was provided, that it wouldn't even change the result in this particular case. So I think what they do is they make an alternative finding that they didn't need to do, which I think in defense of Your Honor's opinions and questions about it, I agree probably not carefully articulated in the decision, but I think that's how they went about with regard to citing matter of COELA, because matter of COELA is clear. It's a motion to reopen, motion to remand. It's a standard with regard to that. Okay. Judge Nygaard, do you have any questions? I have none. Thank you. Thank you. Well, thank you, Your Honor. If you want to finish up, go ahead. Well, thank you, Your Honor. And again, and I think what we really need to keep sight of here is really the standard here before this Court and whether or not this record of evidence compels a contrary conclusion. And as indicated in Respondent's brief and as argued here today, taking into account the agency's decision, I feel as though it does not compel a contrary conclusion. And we ask that you affirm. Thank you so much, Your Honor. Thank you, sir. By the way, you're not from South Philly, are you? Excuse me? You're not from South Philly, right? I'm from Boston. Okay. Thank you, sir. If he was from South Philly, I'd have to apologize. Your Honor, if I may just respond to a couple of points made by Attorney Leo. First, Attorney Leo is faced with a difficult record here. I believe, acknowledge that the government of Honduras is not able to do their job well, at the very least when it comes to protecting its citizens from harm. At that point, I would direct the Court to its decision in Garcia, where the Court held that willingness to protect somebody from harm sheds no light on the government's ability to protect somebody from harm. So even if the government was willing here, that wouldn't be enough. Here, being unwilling or unable would get Mr. Mendoza to satisfy his standard. Secondly, Your Honors were asking about whether Mr. Mendoza needed to go to this particular judge or could have gone to other judges. We obviously agree that this problem is endemic to the Honduran judiciary. I'd also direct Your Honors to page 170 of the record. Mr. Mendoza's testimony was asked about this by the immigration judge and testified. I apologize. I only went to this court because they are the ones who give the order to the national police to do an arrest and detention. Again, this was the testimony of the record that Mr. Mendoza offered. And thirdly and lastly, discussing the State Department report, which was the only piece of country condition evidence that was put into evidence by the government, that also supports Mr. Mendoza's position. I would direct Your Honors to page 413 of the record regarding, by quoting the Department of State, the Constitution and law provide for an independent judiciary, but the justicism was poorly funded and staffed, inadequately equipped, often ineffective, and sometimes subject to intimidation, patronage, corruption, and political influence. And given that, it's Mr. Mendoza as a minority against the majority party in control of the government and in control of the judiciary. We think that the evidence here, and certainly agree that at the very least demands a remand, but that this court could find, based on this record, that the government of Honduras is unable or unwilling to protect Mr. Mendoza from harm. And unless Your Honors have any other questions, we respectfully ask the court to grant Mr. Mendoza's petition for review. Thank you very much, and thank you to both counsel for both presented arguments, and we'll take the matter under advisement. Thank you, Your Honors.